# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF: 1332 BELMONT<br>STREET NORTHWEST, #301 IN WASHINGTON, DC<br>UNDER RULE 41 | )<br>)<br>)<br>)    Case No.  19-SW-52<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A  incorporated herein and included as part of this Application for a Search Warrant.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B incorporated herein and included as part of the attached Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252, 2252A | Distribution and Possession of Child Pornography |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Thomas Sullivan, Metropolitan Police Department
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____02/14/2019_____

City and state: __Washington, D.C.__

_____
*Judge's signature*

G. Michael Harvey, United States Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    19-SW-52 |
| IN THE MATTER OF THE SEARCH OF: 1332 | ) | |
| BELMONT STREET NORTHWEST, #301 IN | ) | |
| WASHINGTON, DC UNDER RULE 41 | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A  incorporated herein and included as part of the Application for a Search Warrant.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit.

**YOU ARE COMMANDED** to execute this warrant on or before     February 28, 2019        *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.       ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      2/14/19 _____          _____
                                                                              *Judge's signature*

City and state:      Washington, D.C. _____      G. Michael Harvey, United States Magistrate Judge
                                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    19-SW-52 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is 1332 Belmont Street Northwest, Apartment 301, Northwest in Washington, DC, which is a residence located within a tan in color brick apartment building with the numerals "1332" marked above a glass entry door.  The apartment is fronted by a brown colored door, and the numbers "301" which are in a silver in color font on the front door, just above a peep hole.

## ATTACHMENT B

*Property to be seized*

1.      The items to be seized are fruits, evidence, information relating to, contraband, or instrumentalities of violations of Title 18, United States Code, Sections 2252(a) and 2252A(a) relating to the distribution, receipt and possession of visual depictions of minors engaging in sexually explicit conduct and child pornography, including, but not limited to:

a.      Child pornography;

b.      Child erotica;

c.      Visual depictions of minors engaged in sexually explicit conduct;

d.      Information, correspondence, records, documents or other materials constituting evidence of or pertaining to items "a" through "c" above (namely child pornography, child erotica, and visual depictions of minors engaged in sexually explicit conduct), or constituting evidence of or pertaining to the possession, receipt, distribution, or transmission through interstate or foreign commerce of items "a" and "c" above, or constituting evidence of or pertaining to an interest in child pornography or sexual activity with children, including:

   i.      Correspondence or communications, such as electronic mail, chat logs, and electronic messages;

   ii.     Internet usage records, user names, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, account, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files;

   iii.    Diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the computer and internet websites;

   iv.     Shared images, "friends lists" and "thumbnails"; and

   v.      Financial records, including credit card information.

e.      The items listed in "a" through "d" above may be seized in whatever form, visual or aural, and by any means by which they may have been created, stored, or found, including:

i.      Any computer, computer hardware (including input/output peripheral devices), computer software, router, computer-related documentation, related peripherals, and digital cameras, including:

      *    tapes, tape systems, and tape drives, cassettes, cartridges, streaming tapes, disks, disk drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks;

      *    hard drive and other computer related operation equipment;

      *    monitors, printers, modems, scanners;

      *    hardware and software manuals, passwords, data security devices;

      *    related documentation;

ii.     Handmade form, including writings, drawings, paintings;

iii.    Photographic form, including microfilm, microfiche, prints, slides, motion picture, films, videos and photocopies;

iv.    Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including but not limited to JPG, GIF, TIF, AVI, MPG, and MPEG);

v.     Mechanical form, including books, magazines, printing and typing;

vi.    Electrical, electronic or magnetic form, including

      *    tape recordings, cassettes, compact disks, backup tapes;

      *    electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMS, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multimedia Cards (MMCs), memory sticks, flash memory devices, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks;

      *    digital data files;

      *    printouts or readouts from any magnetic, electrical or electronic storage device; and

vii.   Originals, photocopies, other copies and negatives.

2.      Digital devices used in the commission of, or to facilitate, the above described offenses, including distribution, receipt, and possession of child pornography in violation of 18 U.S.C. §§ 2252(a) and 2252A(a).

3.      For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.  evidence of the times the Device(s) was used;

    f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

3

g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.  records of or information about Internet Protocol addresses used by the Device(s);

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.  Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data

4

(excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH
OF: 1332 BELMONT STREET
NORTHWEST, #301 IN WASHINGTON,
DC
UNDER RULE 41**

**SW No.  19-SW-52**

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Thomas Sullivan, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a warrant to search the premises known as 1332 Belmont Street,
Apartment #301, in Washington, D.C., hereinafter "PREMISES," further described in
Attachment A, for the things described in Attachment B.

2.      I am currently assigned to the Federal Bureau of Investigation FBI / MPD Child
Exploitation Task Force (CETF) and Northern Virginia Regional Internet Crimes Against
Children (ICAC) Task Force where my duties include investigations pertaining to the sexual
exploitation of children and on-line offenses involving children, including the production,
transportation, distribution, receipt and possession of child pornography.  I have been a member
of the Metropolitan Police Department in the District of Columbia since March 2009.  In 2015, I
was promoted to Detective Grade 2 and am currently serving at this rank.  During my 9 year
tenure with the Metropolitan Police Department, I have been assigned to the Third District Patrol
Operations, Third District Vice Squad, Homeland Security Intelligence Fusion Division, and

since 2014, to Youth and Family Services Division.  I am currently assigned to the Northern

Virginia Regional ICAC Task Force and the MPD / FBI (CETF).

3.      I have received training in numerous areas relating to child exploitation, including

the following training: I have made numerous arrests and interviewed numerous victims,

witnesses, and suspects.  I have participated in numerous child abuse investigations, child sex

abuse investigations, and ICAC investigations.  In January 2018, I was deputized as a Deputy

United States Marshall assigned to the MPD / FBI CETF, and have participated in numerous

online child exploitation investigations and undercover online investigations.

4.      As a task force member, I am authorized to investigate violations of United States

laws and to execute search warrants issued under the authority of the United States.  I have

gained experience in such investigations through formal training and on-the-job training with

more experienced detectives and agents.  I have received training and experience in interviewing

and interrogation techniques, peer-to-peer file sharing investigations, arrest procedures, search

warrant applications, surveillance, and a variety of other investigative tools available to law

enforcement officers.

5.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents, witnesses, and agencies.  This affidavit

is intended to show merely that there is sufficient probable cause for the requested warrant.  It

does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, I

respectfully submit that there is probable cause to believe that violations of Title 18, United

States Code Sections 2252 (Activities Relating to Material Involving the Sexual Exploitation of Children), and 2252A (Activities Relating to Material Constituting or Containing Child Pornography) have been committed by Ryan Manning Cooper.  There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## **PROBABLE CAUSE**

7.      United States law, Title 18, United States Code 2258A, requires Electronic Service Providers (ESPs), such as Tumblr, and Internet Service Providers (ISPs) to report any instances that violate federal laws regarding the sexual exploitation of children.  This law identifies the National Center for Missing and Exploited Children ("NCMEC") as the central repository for these reports.  The ESPs generate  "CyberTip" reports where a suspected violation of federal child exploitation laws has occurred, which are subsequently reviewed by NCMEC analysts who forward this information to local law enforcement when they are able to determine the identity and/or location of the target subject.

8.      On July 23, 2018, an employee of the social media website, Tumblr, reported to the National Center of Missing and Exploited Children (NCMEC) that images of suspected child pornography had been located on the Tumblr website.   Specifically, the employee advised that the images had been located on the page with a URL of finestrawfucking.tumblr.com.  NCMEC subsequently forwarded this information to the Northern Virginia Internet Crimes Against Children (ICAC) Task Force, and the investigation was then assigned to your affiant.

9.      Tumblr reported that an individual using the screen/user name of "finestrawfucking" had posted several images of nude boys on the user's assigned website/blog,

3

which has a URL of finestrawfucking.tumblr.com.  Tumblr advised that the user had posted the images from June 16, 2018 until July 22, 2018.  Tumblr additionally reported that the user had accessed Tumblr from an IP address of 73.87.241.90.  An email address of gwgtownarea@gmail.com was the email address used to register the account.

10.     Tumblr provided a total of twenty images to NCEMC, which they advised that their employees had viewed prior to sending to NCMEC, and were then provided to your affiant. Your affiant reviewed the images, and found that nineteen of the twenty images depicted Caucasian pre-pubescent males, that were in some state of undress or completely nude.  The boys in the photographs all had light hair, and that majority of the photographs were focused on the boys' genitals, buttocks, or anus.

11.     Your affiant was provided with five other NCMEC cybertips in reference to this same blog post.  These additional cybertips provided other users who had viewed or commented on the original blog post by "Finestrawfucking."  Some of these users also provided additional content to the blog post, which was not provided by Tumblr to NCMEC.

12.     An administrative subpoena was issued to Comcast for subscriber information, and geographic location for the IP address of 73.87.241.90.  Comcast subsequently provided this information, and advised that the address of service is 1332 Belmont Street Northwest, #301, in Washington, DC.  Comcast reported that Michael Cooper was the subscriber for the Comcast service.

13.     An administrative subpoena was issued to Google in reference to the email account gwgtownarea@gmail.com which was identified by Tumblr as belonging to the target account.  Google advised that this account belonged to an individual who registered with the

name "Hey Whatup" and a phone number of (978) 210-9996.  A recovery email of

clypinto1@gmail.com was provided by Google.

14.     An administrative subpoena was forwarded to Google for the identified recovery

email of Clypinto1@gmail.com. Google advised that this account belonged to an individual who

registered with the name "Ryan" and provided a recovery email of

ryan_cooper@brewsteracademy.org.

15.     The phone number of (978) 210-9996 was identified as belonging to an AT&T

Wireless subscriber, and an administrative subpoena was issued to identify the subscriber

information.  AT&T Wireless responded to the subpoena and advised that Ryan Cooper of 1332

Belmont Street Northwest, #301, in Washington, DC was the subscriber for the account.

16.     A database check of 1332 Belmont Street Northwest, #301 in Washington, DC

was conducted by your affiant.  This records check revealed that two males named Michael

Cooper, and Ryan Manning Cooper resided in the apartment.  The address had been used by

Michael Cooper since March 31, 2012, and used by Ryan Manning Cooper since November 7,

2016.

17.     On October 17, 2018, an employee of the social media website, Tumblr,

submitted another report to the NCMEC that images of suspected child pornography had been

located on the Tumblr website.   Specifically, the employee advised that the images had been

located on the page with a URL of annoyinglyunadulterateddreamland.tumblr.com.  NCMEC

subsequently forwarded this information to the Northern Virginia ICAC Task Force, and the

investigation was also assigned to your affiant.

18.     Tumblr reported that an individual using the screen/user name of "annoyinglyunadulterateddreamland" had posted several images of nude boys on the user's assigned website/blog, which has a URL of annoyinglyunadulterateddreamland.tumblr.com. Tumblr advised that the user had posted the images from September 16, 2018 to October 25, 2018. Tumblr additionally reported that the user had accessed Tumblr from an IP address of 73.87.241.90. An email address of clypinto1@gmail.com was the email address used to register the account.

19.     Tumblr provided a total of twenty-six files to NCEMC, which they advised that their employees had viewed prior to sending to NCMEC. These files were then provided to your affiant from NCMEC. Your affiant reviewed the images, and found that all the images depicted Caucasian pre-pubescent males, that were in some state of undress or completely nude. The boys in the photographs all had light hair, and that majority of the photographs were focused on the boys' genitals, buttocks, or anus. Three of the images provided to your affiant displayed males who appeared to be minors with erect penises penetrating their mouths.

## TECHNICAL TERMS

20.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data

storage facility or communications facility directly related to or operating in conjunction with such device.   *See* 18 U.S.C. § 1030(e)(1).   Computers are physical units of equipment that perform information processing using a binary system to represent information.   Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.   Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in

part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

    c.  A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

    d.  A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a

8

user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.

10

By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.   Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

11

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

21.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.     Individuals who engage in online criminal activity, including Title 18, United States Code Sections 2252 (Activities Relating to Material Involving the Sexual

Exploitation of Children), and 2252A (Activities Relating to Material Constituting or Containing Child Pornography), and the manner in which digital devices may be used in the commission of those offenses, e.g.: not only use computers to access websites used for illegal activity and to communicate with co-conspirators online, but that they also store on computer hard drives and other electronic storage media documents and records relating to their illegal activity. Online criminals store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifier for instant messaging and social medial accounts.

b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage

13

space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

22.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs,

14

applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated

with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

        c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

        d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

        f.      I know that when an individual uses a digital device to receive and distribute child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of

committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

METHODS TO BE USED TO SEARCH DIGITAL DEVICES

23.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific

17

procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.        Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.        Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including

substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

    e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type

of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

       f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      24.    The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword"

21

searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.   In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

25.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
Thomas Sullivan
Detective/Task Force Officer
Metropolitan Police Department

Subscribed and sworn to before me on February 14, 2019

_____
HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

22